## WILBER *vs.* SISSON.

Where the owner of land agrees to pay the occupant, for working the same on shares, the value of a certain portion of the crops and produce, the parties are tenants in common of the crops, &c. In such a case the occupant does not become a tenant, and the agreement between him and the owner is not to be construed as a lease.

Where the agreement is of such a nature as to constitute a tenancy, as distinguished from an occupancy to work the land on shares, there the products become the property of the tenant, and he can use, sell or dispose of them as he may choose.

G. agreed with C. to work the dairy and land of the latter for one year, from the 1st of March 1865, upon the terms mentioned in a written agreement between them. For the use of the farm and dairy he was to deliver to C. 9600 lbs. of good merchantable cheese, made at a specified cheese factory. The agreement contained no words by which the premises and the cows were leased and demised to G. nor any agreement on the part of G. to pay any thing for their use, by way of rent, but began by declaring that G. agreed "to work" the dairy and land of C. on the "following terms." It then

Wilber *v.* Sisson.

stated as a part of such terms, that C. should furnish good dairy cows to the number of fifty; that G. should work the land, and that it should be occupied by the cows. The cows were to be at the risk of G. during the year, and if any of them should be injured or die, he was to pay the damages occasioned by such injury, and to replace such as should die. He was to work the land in a good, faithful, farmer-like manner, and raise all the grain, grass and corn that he could, with good faithful tillage of the land. He was to provide the seed-corn and deliver half the crop raised from it to C. The crops were to be fed to the cows on the farm, his own team and his family, and he was prohibited from selling any part of the crops without C.'s consent. Whatever hay or other fodder was left in the spring, was to be the property of C. and if it fell short, during the winter, C. was to supply the deficiency.

*Held* that this was not an agreement for the leasing of the premises to G. constituting a tenancy, but was an employment of the latter to work the land and carry on the dairy upon shares.

The agreement mentioned the cheese which C. was to receive as *his* part of the cheese, and this the occupant agreed to deliver to him, free of charge, at whatever place it should be contracted to be delivered at; and it was provided that C.'s part of the cheese should commence to be made the 15th of May, 1865; that he should have a certain number of pounds for his part; that G. should pay the cheese factory for making C.'s part of the cheese; and that all the rest of the cheese and butter should be G.'s. *Held* that these stipulations, taken together, showed an intention on the part of the parties that the cheese should be manufactured from the milk of the dairy, and that the quantity to be delivered to C. was to be his part or share of the aggregate products. And that, so construed, they harmonized with the other provisions and stipulations indicating that the farm and dairy were to be carried on by G. on shares.

*Held, also,* that the agreement, by providing that G. should own only the residue of the cheese, in effect excluded him from owning any part of C.'s share. That it was competent for the parties so to agree, and they having done so, it necessarily left C. the owner of all that was produced by the dairy, which it was not provided that G. should have.

THIS action was brought to recover the sum of $400.19, which the defendant had received as the proceeds of the sale of a quantity of cheese manufactured and sold by the First Collins Cheese Factory. The plaintiff claimed to recover the money as the assignee of Peter Gamel, to whose credit the money stood on the books of the factory. Whatever right he had to the money, was in some manner,

though how does not appear by the case, derived from his brother John Gamel. The defendant claimed to hold the sum of $349.13 of the money as the property of Ansel F. Conger, who claimed it under the terms of agreement made between himself and John Gamel. The court directed a verdict for the plaintiff, to which the defendant excepted. He also excepted to such direction so far as it directed a recovery for any greater sum than the difference between the amount claimed by Conger, and the whole amount of money claimed by the plaintiff in this action. The jury rendered a verdict for the plaintiff for the sum of $445. And the exceptions taken were ordered to be first heard at the general term.

*C. C. Torrance,* for the plaintiff.

*John Ganson,* for the defendant.

*By the Court,* DANIELS, J. The plaintiff derived whatever right he has to the money in controversy from John Gamel, under the agreement made by the latter with Ansel F. Conger; and the defendant, as the treasurer of the cheese factory, under the authority conferred by the same agreement, insists upon holding so much of it as is really in controversy, for Conger. By the course of business adopted at the factory, the money received from the sale of cheese was paid to the person to whom it stood credited upon the books and to whom the check or account for it was issued. But the evidence tended to show that Conger not only did not assent to the moneys in question being disposed of in that manner, but beyond that he positively dissented to such a disposition being made of them. No right to the moneys can be derived from the custom prevailing at the factory, so long as that custom was not assented to by Conger. Besides that, if the money belonged to Conger, a custom by which he could be deprived of it

Wilber *v.* Sisson.

.and another person allowed to receive and hold it, would be unreasonable and unjust, and, therefore, invalid. The rights of these parties depend upon the construction which should properly be placed upon the agreement between John Gamel and Ansel F. Conger, unaffected by the manner in which the business of the cheese factory was transacted. By this agreement John Gamel agreed to work the dairy and land of Conger from the 1st of March, 1865, for the period of one year, upon the terms therein mentioned. And for the use of the farm and dairy he was to deliver to Conger nine thousand six hundred pounds of good merchantable cheese, made at the cheese factory in Collins, managed by George Sisson and others. The milk from the dairy was taken to the factory referred to, and it was there manufactured into cheese, and from the sale of a part of such cheese the moneys in dispute were received. This cheese, the defendant claims, was, by force of the agreement, the property of Conger, to the extent of the money in controversy, and that he should be permitted to pay the money to Conger, he having claimed and demanded it before the action was commenced.

In construing this agreement the principal object to be attained is to ascertain what was the intention of the parties concerning the title to the cheese that should be manufactured from the milk of the dairy, and that must be done by considering the terms they have made use of in making their agreement, the subject matter to which it related, and the circumstances under which they acted in making it. Agreements of this description are somewhat peculiar, and it has, therefore, been said that in the construction of them courts should not tie themselves to mere words. " The substance should be looked at; and that, as it would be universally understood among farmers, is an agreement between owners and occupants, that the latter should come in rather as servants than tenants, each party taking an interest as common owners in the crops

and other products as they accrue, by way of compensa-tion to the owners for the use of their farm and the occu-piers for their labor." (*Per Cowen J. in Putnam* v. *Wise,* 1 *Hill,* 247.) And accordingly where the owner agreed to pay the occupant for working a farm on shares, the value of one half of all the grain, butter and net proceeds of the sheep and hogs produced from the premises, it was held that they were tenants in common in the crops. (*Tanner* v. *Hills,* 44 *Barb.* 428.) In this class of cases the rule is well settled that the occupant does not become a tenant, and that the agreement between him and the owner is not to be construed as a lease. (*Caswell* v. *Districh,* 15 *Wend.* 379. *Dinehart* v. *Wilson,* 15 *Barb.* 595.) Where the agreement is of such a nature as to constitute a ten-ancy, as distinguished from an occupancy to work the land on shares, there the products become the property of the tenant, and he can use, sell or dispose of them as he may choose. The plaintiff claims that such was the character of the relation created by the agreement made in this instance, while the defendant insists that it was simply an employment of the occupant to work the land and carry on the dairy on shares.

The general tenor of the agreement is not that of a lease. It contains no words by which the premises and the crops are leased and demised to the occupant, and it is as entirely free from any agreement on the part of the occupant to pay anthing for their use by way of rent. Instead of con-taining any words by way of leasing the premises and the cows, it begins by declaring " That the said John Gamel agrees to work the dairy and land of the said Ansel F. Conger on the following terms." Then it proceeds to state, as a part of such terms, that Conger should " fur-nish good dairy cows," to the number of fifty, and that Gamel should work the land, and that it should be occu-pied by the cows. These cows were to be at the risk of Gamel during the year, and if any of them should be

injured or unavoidably die, he was required to pay the damages occasioned by such injury, and to replace such as should die. He was to work the land in a good, faithful farmer-like manner, and raise all the grain, grass and corn that he could, with good faithful tillage of the land. He was to provide the seed-corn and deliver half the crop raised from it to the owner of the land. The seed for the other crops were to be provided by the occupant, and the crops themselves were to be fed to the cows on the farm, his own team and his family, and he was prohibited from selling any part of the crops without Conger's consent. The hay and grain was required to be well secured; the corn stalks foddered out in good shape to the cows, and no other stock besides these cows was to be kept on the premises, except a pair of horses. Whatever hay or other fodder was left in the spring was to be the property of Conger, and if it fell short during the winter he was to supply what was deficient, at his own expense. These are the provisions contained in the agreement relating to the occupancy, use and management of the property. And they are certainly very far from indicating any intention on the part of the parties to it that the property should be leased to the occupant. The stipulations that the occupant should pay all the taxes but the county tax, and should build certain fences and keep the premises in repair, are as consistent with one relation as they are with the other, and are entitled to but slight, if any, consideration in the disposition which should be made of the case.

The compensation which the owner of the property should receive for the use of it, was to be one half the corn raised, one hundred bushels of apples from the orchard, and nine thousand six hundred pounds of cheese. There is no specific stipulation contained in the agreement that this cheese was to be manufactured from the milk given by these cows, or that any part of the milk should

be taken to the factory at which the cheese was to be made. But still it is plainly manifest from the tenor of the agreement itself and the stipulations concerning the cheese, that it was intended by the parties that it should be. And the stipulation that the cows should be at the occupant's risk during the year, is in no way in conflict with this intent. For if any of them were to unavoidably die, the agreement provided that the occupant should replace them with others equally as good, which would not be performed by replacing them at the end of the year. The fair import of the agreement upon this subject is, that they should be replaced at the time when the necessity for doing so should arise. Otherwise the object which the parties intended to accomplish by means of the agreement, which was to carry on the business of a dairy, would, so far as there might be default in that respect, be defeated. The obligation, which by this part of the agreement was intended to be imposed on the occupant, was to keep the number and quality of the cows good during the period for which it was made, which would furnish the occupant with the milk required for manufacturing the cheese. As the business which was to be carried on by the occupant was that of a dairy, a part of which at least is understood to be the manufacture of cheese, that circumstance may not improperly be considered as confirming the conclusion more directly indicated by the tenor of the agreement and the particular clause relating to that subject, that a portion of the milk was intended to be taken to the cheese factory, there to be manufactured into cheese. And the subsequent conduct of the occupant in taking it to the factory for that purpose tends in some measure to show that such was his understanding of the terms of the agreement. But this, though worthy of consideration, of course would not be controlling upon him or others who claim title under him.

Besides the scope and tenor of the agreement indicating

Wilber *v.* Sisson.

that this business was to be carried on upon shares, it contains particular stipulations and statements clearly showing that such was the intention of the parties concerning the use that should be made of the milk produced by the dairy. For in this respect it assumes that the cheese which Conger was to receive was to be made from such milk, and that he was to receive it, not as rent, but as his portion of the products of the dairy. Upon this subject the agreement mentions the cheese which he was, by its terms, to have from the occupant, as his part of the cheese. And this the occupant agreed to deliver free of charge to him, at whatever place it should be contracted to be delivered at. In addition to that, the agreement provided that Conger's part of the cheese should commence to be made the 15th of May, 1865; that he should have nine thousand six hundred pounds for his part, and that the occupant should pay the cheese factory for making Conger's part of the cheese. And it is added to that, that all the rest of the cheese and butter should be Gamel's. These stipulations are very clear and certain, and disclose the purpose of the parties to have been that Conger's share of the cheese was to be manufactured from the milk of this dairy, and they render the previously uncertain agreement of the occupant to deliver cheeese, fixed and definite. When the different parts of the agreement relating to this subject are taken together they very clearly show that no other intention could have been entertained than that the cheese should be manufactured from the milk of this dairy, and that the quantity to be delivered to Conger was to be his part or share of the aggregate products. The terms they have used to distinguish it as his share, or part, are consistent with no other purpose. And so construed, they harmonize with the other provisions and stipulations indicating that the farm and dairy were to be carried on by Gamel on shares. If that had not been the object, it is difficult to see why the agreement should have

Wilber *v.* Sisson.

provided that Gamel should work the farm ; that it should direct the manner in which it should be worked, and the disposition that should be made of the crops; that the corn and apples should be divided ; that Conger should be liable to supply hay so far as it might be deficient, and have the surplus if there should prove to be any ; that the cheese he was to receive was to be his part or share of the cheese; and that Gamel should own the rest of the cheese and butter; which clearly implied that he was not to own that which Conger was to receive.

The fact that Conger was to receive a fixed and specified quantity does not impair his rights as owner of it.   For the agreement, by providing that Gamel should own only the residue, as it does in effect, excluded him from owning any part of Conger's share.   It was competent for the parties so to agree, and having done so it necessarily left Conger the owner of all that was produced by the dairy, which it was not provided that the occupant should have. In a case already mentioned, Cowen, J. remarked, that if " the rent consisted in any amount of grain and wool, in bushels or pounds, without saying from the farm, the owners could have claimed no property in either till delivery, or at least till tender made." (1 *Hill*, 244.) Very plainly intimating that if it were to come from the farm, the case would be the same as though the quantity or share to be received by the owner had been left indefinite in amount.   And substantially to that effect was the ruling made in the cases of *Chamberlin* v. *Shaw*, (18 *Pick.* 278 ;) *Lewis* v. *Lyman*, (22 *id.* 437.)

The verdict in this case should be set aside and a new trial ordered, unless the plaintiff will stipulate to reduce it to the sum of $53.06, and interest thereon from the commencement of this action.

[ERIE GENERAL TERM, September 7, 1868.  *Marvin, Daniels, Davis* and *Barker,* Justices.]