MINNEAPOLIS IRON STORE COMPANY, Respondent, v. WM. BRANUM, Defendant, Monarch Elevator Company, Garnishee, and International Harvester Company of America, Intervener and Appellant.

(162 N. W. 543.)

**Landlord — tenant — relationship — defined — real estate — lessor — lessee — lease — possession of land — grants — title — allegiance to — rent.**

1. The words landlord and tenant denote a well-understood legal relation

Note.—On occupation of premises as a servant and as a tenant, see extensive note in 4 L.R.A.(N.S.) 698.

On sale or mortgage of crops raised upon shares, see note in 23 L.R.A. 468.

The right of a landlord to reserve title to or lien on crops to be raised by his tenant is discussed in a note in 14 Am. St. Rep. 166, and also 119 Am. St. Rep. 122.

existing between the lessor and the lessee of real estate. The relation is contractual, and is initiated by lease (or agreement therefor) at will, from year to year, for a term of years, or for life. The lease or agreement expressly or impliedly grants possession of the lands to the tenant, conveys to such tenant an estate in the land at will, from year to year, for a term of years, or for life, as the case may be. The tenant at all times acknowledges allegiance to the title of the landlord to such land, and the tenant acts in subordination to the title of the land in the landlord, paying rent in some form for the use and privilege of occupation of such land.

**Master and servant — relationship.**

2. A master is one who prescribes the direction, the means, and method of the work, and who controls and directs another, his servant, in the discharge of his duties, whom he may discharge at will, with or without cause; a servant is one who is employed to render personal services to another, his master, and who remains in the discharge of his duties under the control and direction, and subject to the order, of the master in the discharge of the work and duties undertaken.

**Landlord and tenant — contract — nature of — defined — owner of land — grant of use — rent — payable in shares of grain — title to grain — reserved in landlord — by contract — landlord and tenant — relationship created by — tenancy.**

3. Where one, the owner of land, grants the use, occupation, and possession of such land to another for a year or a term of years for a stipulated share of the crop each year for the use of said land, and such contract contains a provision "that the title and possession of all crops or grain so raised on said land during such time of such contract shall be and remain in the landlord until division thereof," *held* that such contract creates the relation of landlord and tenant, and not the relation of master and servant; that the contract is one of tenancy, and not one of hiring.

**Lease — covenant — lien — landlord — tenant — contract between — possession and occupancy of land — granted to tenant — estate in tenant — to land covered by contract — tenants in common of crops — reservation of title in landlord — creates only a lien — chattel mortgage — in nature of advances — by landlord — security for.**

4. Where one, the owner of land by a written instrument, grants the use, occupation, and possession of such land to another for a year or a term of years, and as rent for the use thereof is to receive a stipulated share of the crops or grain raised thereon each year, such a contract constitutes a lease, and the owner of such land is denominated the landlord, and the person to whom said land is let for use and occupation is a tenant. Such lease conveys an estate in such land to the tenant during the time of a lease, and the landlord and tenants are tenants in common of their crops and grain grown or

harvested on such land each year during the time the lease continues in effect; and where such a contract or lease contains a covenant "that the title and possession of all crops and grain raised or harvested on said land during the time of such lease shall remain in the landlord or owner of such land until division thereof," such a provision operates, and the effect thereof is, to create a lien on the tenants' share of such crops in the nature of a chattel mortgage lien to secure the advances, if any, of the landlord to the tenant.

**Tenant — chattel mortgage — may give on his share — attaches to crop — existence of — when appearing above ground.**

5. A tenant of lands upon shares may give a chattel mortgage upon his share of the crops to be grown upon such land for such time as provided, in accordance with the law, and such chattel mortgage will attach to such share of such crops when such crops come into existence, and such crops will, for the purpose of the attaching of the chattel mortgage lien, be deemed to be in existence at least as soon as such crops appear above ground and appear to the natural senses to be in existence.

**Landlord — owner of land — tenant — the one who labors — crops and cultivates — both have property interests — in crops — equal dignity — protection in.**

6. The landlord and tenant are each important factors. The landlord because he is the owner of the fee and furnishes the land upon which the work is to be done. The tenant is also a very important factor, as he does the labor which brings the crop into existence, and cultivates and cares for it until maturity, and produces real value; the crops of grain produced are the result of his toil, and in such crops both the landlord and tenant have a property interest which is of equal dignity, and each should be securely protected in his property rights.

**Lease — crops reservation of title to — in landlord — shares of crops — tenant's share — delivered to elevator — no division made — tickets issued — held by elevator company — garnishment — on elevator company, subsequent to chattel mortgage given — lien of — inferior to such mortgage — mortgage attaches when crop comes into being.**

7. Where the tenant's share of grain, under the ordinary lease containing a provision "that the title and possession of all crops shall remain in the landlord until division," has been delivered to an elevator without any division having been made, and storage tickets are issued therefor to the landlord for his share, and the tenant's storage tickets are issued, but are held by the elevator, and such elevator is served with a garnishment process which, in point of time, is subsequent to a chattel mortgage filed prior thereto against tenant's share of such crops and before division, such garnishment process and lien is junior, and subject to the lien of a chattel mortgage filed against said crop prior to the service of the garnishment process and lien, and such chattel mort-

gage attached to the tenants' share of said crop and became a lien thereon as soon as such crop came into existence, and attaches to the tenant's share of such crop at that time, and not at the time of division of the crop, and such chattel mortgage is a prior lien to the lien by attachment.

Opinion filed March 5, 1917.   Rehearing denied April 28, 1917.

Appeal from the District Court of Benson County, Hon. *C. W. Buttz*, Judge.

Reversed and remanded.

*Lawrence & Murphy*, for appellant.

There was a sufficient division of the grain and vesting of title of the tenant's share in the tenant to warrant us in saying that Branum's mortgage to appellant attached and was a prior lien to the garnishment. The equal value of each share could at least have been ascertained, and each was entitled to his aliquot part.   Gates v. Rifle Boom Co. 70 Mich. 309, 38 N. W. 245; Stone v. Quaal, 36 Minn. 46, 29 N. W. 326; Kaufmann v. Schilling, 58 Mo. 218; First Nat. Bank v. Scott, 36 Neb. 607, 54 N. W. 987; Pickering v. Moore, 67 N. H. 533, 31 L.R.A. 698, 68 Am. St. Rep. 695, 32 Atl. 828.

Identification of the very grains of wheat is not necessary, where it is like and in one mass.   Wilson v. Nason, 4 Bosw. 155; Muse v. Lehman, 30 Kan. 514, 1 Pac. 806.

All persons were bound to take notice of appellant's mortgage.   It was timely and properly filed.   Frankhouser v. Ellett, 22 Kan. 127, 31 Am. Rep. 171; Brackett v. Harvey, 91 N. Y. 214; Muse v. Lehman, 30 Kan. 514, 1 Pac. 808; 5 R. C. L. p. 1050; Ayre v. Hixson, 53 Or. 19, 133 Am. St. Rep. 819, 98 Pac. 520, Ann. Cas. 1913E, 659; Jones, Chat. Mortg. § 481; Ilfeld v. Ziegler, 40 Colo. 401, 91 Pac. 825; Adams v. Wildes, 107 Mass. 123; Kreuzer v. Cooney, 45 Md. 582; Horne v. Hanson, 68 N. H. 201, 44 Atl. 292; Fuller v. Paige, 26 Ill. 358, 79 Am. Dec. 379.

An equitable lien exists upon the proceeds of the grain, in favor of the holder of this mortgage, and especially is this true against anyone with notice.   Howes v. Whipple, 41 Ga. 322.

Plaintiff is estopped to assert or claim a superior right to the intervener, because, by taking a second mortgage upon the same property, he declared himself subordinate in his rights to the intervener, and he

cannot change his position to the injury of the intervener. Sever v. Gregovich, 16 Nev. 325; Horne v. Hanson, 68 N. H. 201, 44 Atl. 292; 16 Cyc. 802.

The division of the tickets was a division of the grain itself. The physical commingling of the grain with other like grain did not affect the title to the property under the storage ticket law. Rice v. Nixon, 97 Ind. 97, 49 Am. Rep. 430; Schindler v. Westover, 99 Ind. 395; Sexton v. Graham, 53 Iowa, 181, 4 N. W. 1090; Nelson v. Brown, 53 Iowa, 555, 5 N. W. 719; Ledyard v. Hibbard, 48 Mich. 421, 42 Am. Rep. 474, 12 N. W. 637; Hall v. Pillsbury, 43 Minn. 33, 7 L.R.A. 529, 19 Am. St. Rep. 209, 44 N. W. 673; State v. Barry, 77 Minn. 128, 79 N. W. 656; O'Dell v. Leyda, 46 Ohio St. 244, 20 N. E. 472; McBee v. Ceasar, 15 Or. 62, 13 Pac. 652; Dole v. Olmstead, 36 Ill. 150, 85 Am. Dec. 397.

When grain is delivered to and placed in an elevator in the due and ordinary course of such business, it is not to be expected that the grain of like kind, belonging to different persons, shall be put into a separate bin or place, but it may be presumed that the depositors of such grain and the warehouseman all intended and expected that it should go into the common mass. These transactions nearly always are contracts of bailment. Rice v. Nixon, 97 Ind. 97, 49 Am. Rep. 430; Dammann v. Schibsby Implement Co. 30 N. D. 15, 151 N. W. 985.

*Torger Sinness* and *Clyde Duffy,* for respondent.

The intervener's mortgage never attached to the grain in question, because its mortgagor never had title to such grain, and, further, the grain had been so intermingled with other grain of like kind that it could not be identified. A mortgage may be given upon property not yet acquired, but the lien of such mortgage never attaches until the mortgagor actually acquires such property or an interest therein, and in the latter case only to such interest. Comp. Laws 1913, sec. 6706.

A cropper does not acquire any interest in the grain raised until a division thereof and final settlement. Especially is this true where the contract reserves title to all crops in the landowner until such conditions have been met. Angell v. Egger, 6 N. D. 391, 71 N. W. 547; Bidgood v. Monarch Elevator Co. 9 N. D. 627, 81 Am. St. Rep. 604, 84 N. W. 561; Hawk v. Konouzki, 10 N. D. 37, 84 N. W. 563; Aronson v. Oppegard, 16 N. D. 595, 114 N. W. 377; Wadsworth v. Owens,

17 N. D. 173, 115 N. W. 667; Simmons v. McConville, 19 N. D. 787,. 125 N. W. 304; Wadsworth v. Owens, 21 N. D. 255, 130 N. W. 932; McFadden v. Thorpe Elevator Co. 18 N. D. 93, 118 N. W. 242; Whithed v. St. Anthony & D. Elevator Co. 9 N. D. 224, 81 Am. St. Rep. 562, 83 N. W. 238; Herrmann v. Minnekota Elevator Co. 27 N. D. 235, 145 N. W. 821.

The division of the storage tickets issued by the elevator company did not amount to a division of the grain, and is wholly immaterial. Hall v. Pillsbury, 43 Minn. 33, 7 L.R.A. 529, 19 Am. St. Rep. 209, 44 N. W. 673; 6 C. J. 1097 note (b).

The obligation of bailment created when an elevator company receives grain into its elevator is of such a peculiar character that the elevator company can fully discharge it to the ticket holder by a delivery of grain of the same kind, grade, and quantity. Best v. Muir, 8 N. D. 48, 73 Am. St. Rep. 742, 77 N. W. 95.

In this case the intervener's mortgage never attached or became a lien upon the grain, because the description in the mortgage is insufficient to identify the grain, and further, the grain was so commingled with other like grain that it could not be identified. Bidgood v. Monarch Elevator Co. 9 N. D. 627, 81 Am. St. Rep. 604, 84 N. W. 561; Blakely v. Patrick, 67 N. C. 40, 12 Am. Rep. 600; Jacobsen v. Christiansen, 18 Utah, 149, 55 Pac. 562; Wattles v. Cobb, 60 Neb. 403, 83 Am. St. Rep. 537, 83 N. W. 195; Williamson v. Steele, 3 Lea, 527, 31 Am. Rep. 652; Barrett v. Fisch, 14 Am. St. Rep. 243, note.

As against third persons the mortgage must point out the subject-matter so that third persons may identify the property covered by aid of such inquiries as the instrument itself suggests. 6 Cyc. 1022, and note 25, 1025, and cases cited in note 34; 7 Cyc. 36; Jones, Chat.. Mortg. 5th ed. § 56; 5 R. C. L. 405, 426, § 58, 441.

There is no question of estoppel in this case. Neither is there anything in the record to disclose the existence of a second mortgage on the grain in question, excepting by an offer of proof made by counsel on the other side after the case was closed and such offer refused by the court. But even so, the holder of a second mortgage is never estopped to question the validity of a first mortgage. 10 R. C. L. 689.

GRACE, J. This is an appeal by the intervener from the judgment and order denying the motion for a new trial.

Action was brought by plaintiff in the district court of Benson county, North Dakota, against defendant, upon a promissory note. In the main action, judgment by default was entered against the defendant. Ancillary to the main action, garnishment process was issued by the plaintiff and served upon the Monarch Elevator Company, as garnishee.

The answer of the garnishee was that on the 16th day of October, 1915, the time of the service of the garnishee by process, the Monarch Elevator Company had in its possession and under its control 1,302$\frac{45}{60}$ bushels of No. 1 Durham wheat, which the defendant, Wm. Branum, claims to own, and further answered by showing that on the 20th day of October, 1915, the International Harvester Company of America, a corporation, served upon this garnishee a notice of claim of lien upon said grain, said notice being marked "exhibit A."

The garnishee also claims a lien for its storage from the 9th day of October, 1915, and for handling charges, in case such grain should be removed. The garnishee, except as stated herein, denies any other liability to the defendant, Wm. Branum. "Exhibit A" was also served upon the plaintiff in the main action.

The International Harvester Company of America appears in this action as intervener, and its complaint of intervention, in effect, is as follows:

That the intervener is a foreign corporation; that on the 23rd day of January, 1913, defendant, Wm. Branum, executed and delivered to this intervener eight promissory notes, as follows; to wit, one note for $42.28, due October 1st, 1913, with interest at 10 per cent; one note for $105.05, due October 1st, 1913, with interest at 10 per cent; one note for $160.68, due October 1st, 1913, interest at 8 per cent; one note for $287, due October 1st, 1913, interest at 10 per cent; one note for $130.05, due October 1st, 1913, interest at 10 per cent; one note for $284.84, due November 1st, 1913, interest at 10 per cent; note for $149.36, due November 1st, 1913, interest at 8 per cent; note for $228.95, due November 1st, 1914, interest at 8 per cent; and three notes dated April 3rd, 1912, one for $800, due November 1st, 1912, interest at 7 per cent; one for $837.57, due November 1st, 1913, in-

terest at 7 per cent; and one for $837.50, due November 1st, 1914, interest at 7 per cent.

That on the 2d day of November, 1914, as a part of the same transaction, and for the purpose of securing payment of such promissory notes, the defendant, Wm. Branum, executed and delivered to the intervener a certain chattel mortgage for one half of all wild and tame crops of every nature now growing, heretofore planted, sown, or grown, cultivated, or harvested, during the year 1915, on the following described real estate in Benson county, state of North Dakota: northeast one quarter (N. E. ¼) of Section 19, south one half (S. ½) of the southeast one quarter (S. E. ¼) of Section 18, and the south half (S. ½) of the southwest one quarter (S. W. ¼) of Section 17, Township 153, Range 71. That the said chattel mortgage was duly filed for record in the office of the register of deeds of Benson county, on the 7th day of November, 1914.

The complaint of the intervener further alleges in reference to said mortgage the further conditions usually found in such chattel mortgage as to the powers such mortgagee might exercise in case default occurred in said mortgage, and alleges a power of sale, and also alleges default in terms and conditions of said chattel mortgage. The complaint of intervener further alleges that certain crops were grown and harvested upon said land during the year 1915; that said crops were subject to a lien and encumbrance of this chattel mortgage, and that such crops were delivered to and deposited with the garnishee, the Monarch Elevator Company, by the said defendant, Wm. Branum, or his agent, and the proceeds thereof are now in the possession of the said Monarch Elevator Company, and the said Monarch Elevator Company have been duly notified of the said intervener's mortgage and claim to said crops; and further alleges that the garnishment by the Minneapolis Iron Store Company, in so far as the same relates to the grain raised upon said described premises, or the proceeds thereof, now in the possession of the said Monarch Elevator Company, is wholly subject to the lien encumbrance of the intervener's mortgage, and this intervener is entitled to the possession of said crops for the purpose of foreclosure of said mortgage, or if said crops have been sold, then said intervener is entitled to have the lien and encumbrance impressed as against said proceeds.

The plaintiff in the action then served the following amended answer to complaint in intervention in effect as follows: The plaintiff, answering the allegations contained in the complaint of intervention of International Harvester Company of America, alleges it has no knowledge or information sufficient to form a belief as to the allegations contained in paragraphs 2, 3, 4, 5, and 7, in said complaint, and therefore denies same. The plaintiff admits that during the year 1915, certain crops were raised and harvested upon said land; it is alleged that prior to planting of said crops, and at all times thereafter, said premises were owned by Knute T. Erickson and Theodore Erickson, and that the crops planted and harvested upon said described premises in the year 1915 were planted and harvested by the defendant, Wm. Branum, under and by virtue of a certain contract of lease, bearing the date of March 26th, 1915, and entered into between the said Erickson, as owner of said premises, and the defendant, Wm. Branum, as lessee, which said contract was the usual croppers' contract, and, among other things, provided that until the division thereof, the title and possession of all the hay, grain, crops, and produce raised, grown, or produced on said premises should be and remain in Ericksons. Alleges further that crops of 1915, so raised upon said premises, were at no time divided, and further alleges that by reason of conditions of said contract the defendant never acquired any title, interest, or right to or possession of the said crops raised upon said premises during the year 1915. Said answer further alleges said crops were hauled to the Monarch Elevator Company without division, and were stored therein for general storage, under the direction of the Ericksons, the owners thereof, and the said crops were thereupon mingled with other grain in said elevator and their identity was entirely lost. Said answer further alleges that under the direction of the Ericksons, the garnishee issued to the defendant, Wm. Branum, storage tickets in the form described by law, entitling defendant to $1,302^{45}\!/\!_{60}$ bushels of No. 1 Durham wheat, said storage tickets representing crops raised upon the said premises in the year 1915, and delivered to said Monarch Elevator Company. Said answer further alleges said storage tickets do not entitle defendant to any part of the crops raised upon said premises for the year 1915, but merely to the number of bushels hereinbefore mentioned as to the same kind and quality of grain; and further alleges, it is the grain to which

defendant is entitled to under said storage tickets that is disclosed by the garnishee, and which is claimed by the defendant under this garnishment. Said answer further denies that the mortgage of the intervener has attached to any part of the crops raised upon said described premises during the year 1915, or become a lien thereon, and denies that the said intervener has any mortgage, lien, claim, or demand on or against any grain or proceeds thereof belonging to the said defendant, and now in the possession of the said garnishee, and said answer demands that the International Harvester Company take nothing, and that the proceeds of the said grain be applied to the satisfaction of plaintiff's judgment.

The facts in the case are about as follows:

Wm. Branum, the defendant, was a tenant of a certain tract of land under contract with the owners, being the land described in intervener's complaint, containing a condition that Branum did not get title to the crop until the division of the crops thereon. At the time Branum became a tenant he had already executed a mortgage to the International Harvester Company of America, intervener, on one-half interest in the crops to be raised in the year 1915, which was a first mortgage in point of time. Certain crops were raised upon said land in the year 1915 by Branum, and all such crops were hauled to the elevator with the knowledge and consent of both Branum and the Ericksons. It seems to be a fact that certain grain was hauled to the elevator from day to day, and in the evening of each day, after the grain was in for that day, storage tickets were issued for the grain hauled on that day,—one half in favor of the landlord and one half for Branum, the tenant. That the storage tickets issued in favor of the landlord were delivered to them and those issued in favor of Branum were held by the elevator company. The elevator company thus held for Branum, 1,302$\frac{45}{60}$ bushels of No. 1 Durham wheat. The plaintiff sued the defendant and served garnishee summons upon the elevator company, and claimed the right to the proceeds of such grain, regardless of the mortgage of the International Harvester Company, filed November 1st, 1914, claiming such mortgage never attached to defendant's share of said grain under said contract of lease, for the reason that the title and possession of all the crops raised upon said land under said contract or lease remain in the

landlord until the division thereof, and that there was never any division.

The intervener claimed that the said chattel mortgage attached as a lien against one-half interest of the defendant to said crops so raised upon said land during the year 1915.

The question here presented for consideration is the one which has continually presented much difficulty and about which there has been a great uncertainty every since the pioneer decision concerning this question, found in the case of Angell v. Egger, 6 N. D. p. 391, 71 N. W. 547. Prior to the time of this decision in this state, wherever one had leased land from another for a year or term of years, the one, the owner of the land, was termed the landlord, and the other one, who leased the land, was called tenant, and all their relations were fixed and governed by the well-settled rules concerning landlord and tenant; but at the time when the decision in the Angell v. Egger case was written by this court, it had become quite common to insert in such contracts regarding the leasing of lands a provision providing that the title and possession of all crops raised upon land under such contracts should remain in the landlord until division, and the court, in construing this kind of a contract in the Angell v. Egger case, held that such contracts were not governed by the laws of landlord and tenant, but were governed and would be construed by the law governing the relations of master and servant, and from the time of this decision there has been an eternal and never-ceasing conflict between the laws governing relations of landlord and tenant and the laws governing the relations of master and servant. Each of said branches of law contending for supremacy and privilege of governing the relations between the owners of the land and the tenant of it under such contract, as has been mentioned.

The law concerning landlord and tenant is as old as civilization itself. It came into existence in the infancy of civilization, and has come, by gradual accretion of new rights, privileges, and principles during the centuries of its development, to be considered as one of the most momentous, extensive, and far-reaching branches of the law. On the other hand, the same is true of the law of master and servant. Ever since it has been the privilege of one man to employ the labor of another for hire, and that time is almost coeval with humanity itself,

there have been formulated, evolved, and brought into existence rules of law governing the relations of master and servant, which have also become one of the most momentous branches of the law.

The principles and rules governing these two great branches of the law have become immutably fixed. The laws in these two great relations have in all these centuries become as positive and fixed almost as the laws of gravitation; almost as fixed as the stars in the firmament; almost as constant as the revolution of the Heavenly bodies about the sun, and it is about as impossible to apply the law of master and servant to a relation which is in fact that of landlord and tenant, as it is to invert the very laws of nature. We might just as well expect the apple, when it becomes loosened from the bough, to ascend heavenward, instead of falling to the earth in obedience to the laws of gravitation. We might as well expect the centripetal and centrifugal forces to become reversed in their properties. We might as well expect that the seasons of the year will reverse their regular recurring order, thus hoping to change the fixed laws of nature, as to hope and expect that we can invert the forces, principles, and relations of two of the greatest branches of the civil law and expect harmony, and hence, ever since the decision in the case of Angell v. Egger, where the court sought to apply the law of master and servant to a relation which is plainly that of landlord and tenant, there has been an unrelenting and unceasing struggle on behalf of the law of landlord and tenant to assume its proper functions, and retake and regain its privilege and powers, usurped by the law of master and servant in the case of Angell v. Egger. All during the twenty years since that decision the struggle has never ceased, as is evidenced by the great number of cases in this court involving some branch of the same identical question.

We make this general proposition, that the law of master and servant cannot for one particular thing, and in one particular covenant, usurp the privileges and functions of the law of landlord and tenant, and not maintain in every other covenant and condition containing such lease its same position as master and servant, and be governed in all other relations that may arise under such a contract by the law of master and servant. Either this must be true, or it cannot assume any of the duties which belong in the realm of landlord and tenant. For the purpose of making the matter absolutely clear, although it may be

elementary, we propose to recite some of the rights, privileges, duties, and obligations incident to landlord and tenant, and also to recite some of the rights, privileges, duties, and obligations incident to master and servant, and to demonstrate that principles and powers possessed by one are entirely different, distinct, and foreign to the rights, privileges, duties, and obligations possessed by the other; and if this can be shown, it should be sufficient to demonstrate the utter impossibility of inverting these two great branches of law, and should show conclusively the impossibility of applying the laws which govern one of these great branches to a subject concededly under the dominion of the other great branch below.

We will now briefly enumerate some of the powers, privileges, and duties of landlord and tenant.

We will first notice definition of "landlord," he of whom lands or tenaments are holden. "He who, being the owner of an estate in land, has leased the same for a term of years, on the rent reserved, to another person, called a tenant." See Jackson v. Harsen, 7 Cow. 326, 17 Am. Dec. 517; Becker v. Becker, 13 App. Div. 342, 43 N. Y. Supp. 17.

"Landlord and tenant," a phrase used to denote the familiar legal relation existing between lessor and lessee of real estate. The relation is contractual and is constituted by lease (or agreement therefor) of lands for a term of years, from year to year, for life, or at will. See Black's Law Dict. 696.

The relation of landlord and tenant is that which subsists by virtue of a contract for the possession of land at will, for definite period or for life. Foss v. Stanton, 76 Vt. 365, 51 Atl. 942.

The relation of landlord and tenant arises under contract, express or implied, for possession of lands or tenements, in consideration of certain rent to be paid therefor. *Possession being an essential element.* Whiteside v. Oasis Club, 162 Mo. App. 502, 142 S. W. 752.

The reservation of rent in some form, and allegiance to the title, are distinguishing characteristics of the contract by which relation of landlord and tenant exists. Andrews v. Erwin, 25 Ky. L. Rep. 1791, 78 S. W. 902.

The tenant is defined as one who holds or possesses lands or tenements by any kind of title, either in fee, for life, for years, at will, or upon sufferance. Powers v. Ingraham, 3 Baarb. 576.

"Tenant" is one who occupies land or the premises of another in sub-ordination to the other's title, and with his assent, express or implied. Francis v. Holmes, 54 Tex. Civ. App. 608, 118 S. W. 883; Sharpe v. Mathews, 123 Ga. 794, 51 S. E. 706.

The landlord can maintain an action to recover rent or maintain an action for the abandonment of the lease. The landlord cannot terminate the lease which is made for a definite time. When the landlord leases land to a tenant for one or more years, the tenant has an estate in such land for such time, and can hold possession thereof for the whole time. When a landlord delivers possession of the land to the tenant for years the landlord cannot enter upon the premises for any purpose except for those reserved in the lease. The possession is entirely that of the tenant. The tenant also is bound by certain rules. He cannot dispute the title of the landlord to the land. The tenant can maintain actions for trespass against anyone trespassing upon the premises during the time of his lease, including the landlord. In the lease, whether of the usual form between the landlord and tenant or in the form of the so-called "cropper's contract," the landlord cannot exercise any control over the performance of the work or prescribe the manner in which it shall be executed, nor is the tenant bound to obey any of the orders of the landlord.

Discussing for a moment the relation of "master and servant," the relation of master and servant exists where the master can not only order the work, but how it shall be done. When a person to do the work may do it as he pleases, such person is not a servant. The test is very much as follows: A servant is one who for wages serves his employer, following his directions and performing the work. Holmes v. Tennessee Coal, Iron & R. Co. 49 La. Ann. 1465, 22 So. 403, 3 Am. Neg. Rep. 174.

A master is one who not only prescribes the end, but directs, or at any time may direct, the means and method of doing the work. Bailey v. Troy & B. R. Co. 57 Vt. 252, 52 Am. Rep. 129.

The word "servant" ordinarily indicates one, a person, hired for wages to work as the employer may direct. Morgan v. Bowman, 22 Mo. 538.

Where a person in the employment of another is in the discharge of his duties, subject to the immediate direction and control of his employ-

er, he is properly described as a servant. Gravatt v. State, 25 Ohio St. 162.

The distinguishing feature of the relations between master and servant is that the employer retains the control over the mode and manner of doing the work under the contract of hiring. State v. Yeiter, 54 Kan. 277, 38 Pac. 320.

"Servant." A servant is one who is employed to render personal services to his employer otherwise than in pursuit of an independent calling, and who in such service remains entirely under the control and direction of the latter, who is called his "master." Comp. Laws 1913, § 6134.

The contract of employment is a contract by which one who is called the "employer" engages another, who is called the "employee," to do something for the benefit of the employer or the third person. Comp. Laws 1913, § 6105.

The employee must substantially comply with the directions of his employer, furnishing the services on which he is engaged, except when such directions are impossible or unlawful. Comp. Laws 1913, § 6115.

The employer must in all cases indemnify his employee for losses caused by former's want of ordinary care. Hiring is a contract by which one gives to another the temporary possession and use of property other than money for reward, and the latter agrees to return the same to former at a future time. Comp. Laws 1913, § 6079.

A tenant for years, or at will, unless he is a wrongdoer by holding over, may occupy the buildings, take the annual products of the soil, work mines and quarries upon the commencement of his tenancy, and cultivate and harvest the crops growing at the end of his tenancy. Comp. Laws 1913, § 5343.

The relation of master and servant exists when the master not only has the right to select his servant, but his power to remove and discharge him, with or without cause, and to direct what work shall be done, and the manner of doing it. McColligan v. Pennsylvania R. Co. 214 Pa. 229, 6 L.R.A.(N.S.) 544, 112 Am. St. Rep. 739, 63 Atl. 793, 20 Am. Neg. Rep 471.

The essential element in relation of master and servant is the right of master to control the action of the servant, which implies the power to discharge. Kiser v. Suppe, 133 Mo. App. 19, 112 S. W. 1005.

Whether parties engaged in doing the work for another are his servants depends upon the control and direction that he can rightfully exercise over them.  If they are at his command and bound to obey his orders and directions in regard to the work, and can be discharged by him, then they are his servants.   Bentley S. & Co. v. Edwards, 100 Md. 652, 60 Atl. 283.

All of the above definitions relating to landlord and tenant, and master and servant, have been set forth to more clearly define those various relations and to show that it is impossible to make a relation which is in fact one of landlord and tenant come under the relation known as master and servant.  Those contracts in reference to the leasing of lands by the owner thereof to a tenant, which reserve title and possession of the crops to the landlord until division, have been construed by this court in the case of Angell v. Egger to be a contract of hiring, and under that theory, the owner of the land would be master and the tenant would be servant.  If this relation is assumed for the purpose of construing that clause in such contracts relating to the title and possession of the crops raised under such contract, that same relation, if properly assumed with reference to that particular clause of the contract, must also be assumed and maintained in every other relation under such contract between the landlord and tenant.  It cannot be said in construing such a condition in the contract, that the tenant in such case is in fact a servant, and in every other relation arising under such contract is a tenant.  A person leasing such land from one to five years, or more, and entering into possession of it, is either a tenant for all purpose under such contract, or a servant.  Under such a contract the tenant either acquires an estate in such land for years, of which he can hold possession for the whole of his contract period, or he is a mere hired servant, which the landowner can discharge at will, either with or without cause.  The tenant under such a lease either has an estate in such land so that he can maintain trespass against all who interfere with his enjoyment of his estate, or he is a mere hired servant who can be discharged at the pleasure of the master.  The tenant under such lease either has exclusive control of the work to be done in and about raising of the crops, the right to act upon his best judgment as to sowing, planting, and harvesting such crops, and to do all the other work under such contract, in a manner he shall deem proper and fit, or he has nothing to say about

such matters, and is merely a servant, wholly and entirely subject to the control and direction of a master, the landowner, in all of such matters.

In what is called a "cropper's contract" (which is in fact just an ordinary lease), assuming the same to be for a term of five years, can the landlord or the master eject the cropper at any time so long as the cropper performs his covenants. It is sure in any court he can hold possession for the full time of his contract. Why? Because he has an estate in the land for a certain number of years, and thereby cannot be ejected until full term for which he leased the place has expired. This would not be true if he was simply a mere servant of the master and received for his wages a portion of the crop, for the master could discharge him and oust him from possession, and his only remedy would be an action against the master for wages. Under such a contract the so-called "cropper" or "tenant" could maintain an action of trespass against every person who interferes with his possession or right of possession, or who damaged the crops he grew, or in any manner interfered with his enjoyment of such premises during the time of such contract. It is evident he could not do this if he were but the mere servant or hireling of a master or landowner, which again shows that the so-called cropper or tenant of the land has an estate in the land which he can protect against all trespassers, including the landowner himself. Under the same kind of a contract the cropper could insure his share of the crop against loss by hail, and if loss by hail should accrue, no one would doubt but that he could sue the hail insurance company and recover his loss; this he could not do unless he had an estate in the land and an interest in the crop.

Under the construction in the case of Angell v. Egger, 6 N. D. 391, 71 N. W. 547, Angell was simply a servant of Egger, nothing more nor less. That case simply holds that for the whole term of the lease, which was five years, Angell was a servant of Egger. If this is true, then the relationship of Angell and Egger under the contract would be governed by the law of master and servant. Supposing, then, that in the case of Angell v. Egger, and all cases involving similar contracts, the point under consideration should be not such as is involved in the Angell v. Egger case and similar cases concerning the title and possession of the grain until division, but that Angell in the course of his employment had done some negligent act in connection with his em-

ployment, which had caused great damages to a third party, and the third party should sue Egger for the negligence of his servant Angell, would it be conceded that Egger would come into court and admit that Angell was a servant and seek to avoid liability on the ground that Angell's negligent acts were outside the scope of his powers, or some other such grounds; or would his answer be in such case an absolute denial that Angell was his servant, and a further allegation alleging that Angell was his tenant, who had an estate in the land, whose work was not directed by Egger, and the relationship was simply that of landlord and tenant, and therefore Egger was not in any manner responsible for the negligent acts of Angell. We know that in such case Egger would have taken the position that the relation was simply that of landlord and tenant, and for this reason he would not in any manner be liable for the negligent acts of Angell.

So in many and other various relations it can be conclusively shown that such a cropper or tenant has an estate in the land during the time of his contract, and an interest in the crops, all of which can be successfully defended in any court, absolutely showing that the relation between him and the owner of the land is that of landlord and tenant. In their construction of such contracts he is held to be a tenant, except as to clause we are discussing; that is, to the title and possession of the crops until division.

We say that the meaning of such provision in such contract must be deducted by construing such a provision in connection with all other provisions of such contract, and when so construed, such a provision in the contract—that is, that the title and possession of all the crops shall remain in the landlord until division thereof—simply means that the landlord has a chattel mortgage on the tenant's interest for any advances made by the landlord to the tenant.

We wish to discuss the case of Angell v. Egger. In that case the court said: "Whether the agreement between plaintiff and defendant created the relation between landlord and tenant is not material. We may safely assume it to be a lease, and certain provisions of it seem to be inconsistent with any other interpretation of it." We think it is exceedingly material whether the relation of landlord and tenant existed or not. When the court in that case assumed that it did exist, then in

that case Angell had an interest in the real property and in all the crops during the life of the lease. The relation of landlord and tenant existed between Angell and Egger, and if this is true, all of the relations arising under the contract in Angell v. Egger should have been construed according to the law of landlord and tenant.

The court further said: "So he may agree that the title to all crops shall remain in the lessor until happening of a certain event." And also that until the division of the crop, title and possession to all grain, hay, and crops grown upon said premises, shall remain in the party of the second part.

There is no doubt but what such a provision may be placed in a contract; but that is not the question. The question is, When such provision is placed in a lease such as the one we have under consideration, and the one contained in Angell v. Egger case, where it is conceded that the contract is in form and effect a lease between landlord and tenant, how are such words to be construed? Are such words and clauses to govern all the other covenants of the lease, thus changing the meaning of the entire lease and the relationship and the law governing the parties, or, on the other hand, are such words to be construed in connection with all the other covenants of the lease? We say that they must be so construed as to give effect to all the covenants of the lease without changing the relations of the parties. In other words, the plain intention of the parties by such provision in the lease, retaining title and possession of the crop to the landlord, was evidently for the purpose of securing the landlord for any advances he may have made to the tenant, because otherwise the most that the landlord could receive would be his share of rent as stipulated by the lease. He would have nothing more coming, and there is no reason why he should be permitted to exercise dominion over that which does not belong to him unless the clause which we are considering was inserted for the purpose of securing entire advances made by the landlord to the tenant. And if such is the purpose of such a clause in a lease, then plainly the meaning of it is to in some manner secure the landlord for such advances, and thus it would be in the nature of a chattel mortgage lien. It was no doubt thought that by endeavoring thus to get absolute title to the grain and obtain absolute title to the grain under such a clause to the landlord, it would afford the landlord an easy method to satisfy all his demands rather than to pro-

ceed to foreclose his lien. Although he assumes to retain absolute title and possession to such grain by such clause, the facts are, when such a clause is construed with reference to the whole lease with reference to the fact that the tenant can hold possession for the whole time, maintain actions of trespass, and is under no obligations to obey any directions of the landlord about his work, such a provision evidently becomes merely a lien in the nature of a chattel mortgage on the tenant's share of the grain.

In Angell v. Egger, there occurs the following: "Until such time as the plaintiff [lessor] should turn over to the defendant [lessee] the share of the crops coming to him under the contract, the legal title would remain in the plaintiff [lessor]. It may be true that the defendant [lessee] would have an equitable interest therein and could enforce his rights by a suit in equity."

If it is true that Angell, the tenant, was only a servant of Egger, he would have no interest in the crop, either legal or equitable, but his only right would be for wages the same as any servant, and the amount of such wages would be determined by the share of his crop; but if we assume the relation of servant, the only relation existing then is that of master and servant, the only action maintainable by the servant against the master is for wages, and the only purpose that the tenant's share of crop in such a case is to operate as a measure of the amount of wages he is to get; that is, the wages are not fixed. What wages servant gets will depend upon the size of the crop, but in no event under such a theory could the servant have any interest in the crops if the title and possession are in the landlord; they cannot, or any part thereof, be in the tenant.

That case further says that "if the contract constitutes a lease, or, in other words, a transfer of an interest in the land for a specific period, it follows that the title to all crops is in the lessee, for the grant carries with it as an incident the right to the full enjoyment of the thing granted. One who buys the right to use real property for a certain term, secures all the rights of the owner to make profit out of it by its reasonable use."

Applying these words to the lease under consideration in the Angell v. Egger case, we find that the lease in that case was for five years, commencing in 1894 and ending in 1898, both inclusive. Examining such

lease, we desire to propound the query: Could Angell, if he had performed all the covenants of his lease, have been ousted from possession until the expiration of his lease? Plainly, he could not, therefore he had an estate in the land for a specific period, with a full and complete right to the full use and enjoyment of the land described in such lease for the whole time. He could maintain an action of trespass against other persons, or the landlord, if they interfered with his possession or use of the land. Under that lease Angell was in no manner subject to the direction or control of Egger. Angell could do the work as he pleased according to his best discretion and without any control from Egger, the landlord, for that lease contained this provision, "and to furnish and provide all proper assistance and hired help in and about the cultivation and management of said farm, and to farm and cultivate said land to the best advantage. *And according to his best skill and judgment.*" So that it is easily determined that Angell was in no manner subject to the direction and control of Egger in the performance of his work, and therefore was not a servant. Another provision contained in the Angell v. Egger case is, in substance, that Angell, the tenant, should keep the land free from foul weeds, such as mustard, Russian thistle, etc., and deliver the landlord's share in the crops, and that if he failed in these covenants, or any other of the covenants of the lease, during the entire season, Egger the landlord, would have the right to terminate and cancel such lease.

So that it is plainly seen that if Angell should keep all of his covenants, Egger could not cancel or terminate the lease, thus proving that Angell has an estate in the land for a definite time. Further, if Angell was the servant of Egger, there would be no need to bring the action to cancel the lease, as the only thing necessary for Egger to do in that case would be simply to discharge Angell as a servant, which he might do at any time if he were the servant, and the only remedy Angell would have would be an action for his wages, the amount of which would be measured by a certain share of the crop, in which it is claimed in the Angell v. Egger case he had no interest, the title and possession thereof being wholly in the landlord.

It is very apparent that the contract involved in the Angell v. Egger case was in truth and in fact a lease which created the relation of landlord and tenant, and which secured to Angell an estate in the land

for five years which could not be interfered with by Egger so long as Angell kept his covenants, and yet Angell was held in that case a mere servant of Egger.

This court since that time has followed this case, but in many of the cases the court has wavered, and in several cases made holdings that in effect reverse the principle laid down in Angell v. Egger. There have been twelve or fourteen cases on the question in consideration since the Angell v. Egger case. This, in itself, demonstrates that the principle of law laid down in the Angell v. Egger case is not a correct principle; if it were, this court would uniformly adhere to the principle laid down in the Angell v. Egger case, rather than in many ways seek to avoid the principle there laid down. Several of the cases since the case of Angell v. Egger follow the principle therein laid down, such as Bidgood v. Monarch Elevator Co. 9 N. D. 627, 81 Am. St. Rep. 604, 84 N. W. 561; Aronson v. Oppegard, 16 N. D. 595, 114 N. W. 377; Wadsworth v. Owens, 21 N. D. 255, and 130 N. W. 932; Hawk v. Konouzki, 10 N. D. 37, 84 N. W. 563. In Van Gordon v. Goldamer, 16 N. D. 323, 113 N. W. 609, the court looked upon the provision of the contract pertaining to the title to all the crops as one of security, for, construing this provision in that case the court said: "That the lien of a mortgage may be waived by the mortgagee cannot be questioned, and such lien may be waived by parol, . . . and it may be impliedly waived, by conduct of the lienholder inconsistent with the existence of a lien." The court further says in the Van Gordon v. Goldamer case: "Did the defendant Baird waive his right as owner or holder of a lien on the crop raised by defendant in 1905, either by agreement or by his acts?" So that it seems to appear in the Goldamer Case that the court assumed such a provision in the lease to be simply a right for a lien in the nature of a chattel mortgage, and is inconsistent with the holdings on the question as in Angell v. Egger. In the case of Aronson v. Oppegard, supra, under the same kind of provision in the lease, retaining the title in the lessor, it was held that the plaintiff was only entitled to the actual damages suffered by him "by reason of the unlawful taking of property;" he was not entitled to damages to the full extent of the value of the property, but to the extent of his interest therein by reason of having made advances to Jacobson; and it is further said that in such case he is entitled to damages only to the extent of his

lien, and especial damage in certain cases; and it is further said that the defendant in such case is entitled to show the extent of such a lien. We may observe that where one has the absolute title or all the title and the possession, there is nothing in the hands of the other party on which to have a lien, and in these cases involving such claims, it seems to be very convenient to use the word "lien" and it seems to us the proper word to use because it expresses a true condition, for the landlord really had nothing coming excepting his rent and a lien, if he has made advances; so we might go on with all the other cases that have been brought to this court involving the same question, and we would find some strictly following Angell v. Egger, and others wavering, and holding that such clause operates as a lien only in favor of the landlord. In the case of Stavens v. National Elevator Co. ante, 9, 161 N. W. 558, in a well-written opinion by Justice Christianson considering this identical clause wherein the title to all crops is reserved to the owner, it is held that the right of the parties to such action "must be determined upon equitable principles," and the landlord is entitled to recover such amount only as would compensate him for the amount of his actual interest in such grain. This is a step in the right direction, another step nearer home, another step towards solid ground.

The attorneys for respondent have filed a supplemental brief, have given citation showing that the cropper is a servant. We have fully discussed that matter heretofore in this case, and the decision cited by the respondent in the supplemental brief would not apply upon the holding in this case, that the lessee is a tenant with all the rights, duties, and privileges of a tenant, and not a cropper or a servant, and the further question raised on the trial of the case as to when the crop came into existence will be discussed in the next paragraph.

The intervener in the case under consideration held a chattel mortgage against Branum, the tenant, which, if it attached and became a lien upon the grain in question at any time, is a first lien, and the point is now to ascertain, When do crops or personal property come into existence? Whenever this point is determined, the point of time when the chattel mortgage attaches to such property will, we think, be determined. Section 6706, Comp. Laws 1913, is as follows: *"Liens on future interest.* An agreement may be made to create a lien upon property not yet acquired, or not yet in existence, by the party agreeing to

give the lien. In such case the lien agreed for attaches from the time when the party agreeing to give it acquired an interest in the thing to the extent of such interest."

Section 6707 is as follows: "A lien by contract upon crops shall attach only to the crop next maturing after the delivery of such contract, except in the case of liens by contract to secure the purchase price, or rental, of the land upon which such crops are to be grown."

In Gorder v. Hilliboe, 17 N. D. 281, 115 N. W. 843, it was held that a mortgage on the crop given in December, 1903, was and did cover the crops for the year 1904. In Grand Forks Nat. Bank v. Minneapolis & N. Elevator Co. 6 Dak. 357, 43 N. W. 806, it was held that a mortgage on any growing crop need not be refiled after its growth. As to whether a chattel mortgage on unplanted crops is within statute, see all the cases cited under § 6706, Compiled Laws 1913, above referred to. Section 6709, Compiled Laws 1913, provides as follows: "Notwithstanding an agreement to the contrary, a lien or a contract for a lien transfers no title to the property subject to the lien." Title to mortgaged property remains in mortgagor; Sanford v. Duluth & D. Elevator Co. 2 N. D. 6, 48 N. W. 434, and other cases cited under last section.

All property is divided into two classes: Property is either real property or personal property. Crops of growing grain are personal property, and in modern times are denominated "emblements." Emblements have been defined as vegetable chattels, such as corn or other growth of the earth, which are produced annually, not spontaneously, but by labor and industry, and thence are called *fructus industriales;* See Reiff v. Reiff, 64 Pa. 137. Wharton defines growing crops thus: "Vegetable productions of the soil which are annually produced by the labor of a cultivator." They are deemed personal property, and pass as such to the executor or administrator of an occupier, whether he were the owner in fee, or for life, or for years. If he died before he has actually cut, reaped, or gathered the same, and this, although being affixed to the soil, they might for some purposes be considered while growing as part of the realty; "we consider them as only personal property."

We have noticed that our statute recognizes the right to a mortgage on property not yet in existence, as to the time when the crops come into existence. We may safely assume, and after the ground has been

prepared for the crop, the seed planted and germinates, and the growth of the crop appears above ground, that the crop is in existence. We must also concede that a crop of growing grain is some kind of property; it must then follow in the definition heretofore given of the different classes of property, that is, it is either real or personal property.

In Raventas v. Green, 57 Cal. 255, the court said: "There is no doubt that an unripe growing crop of grain is property. It is property subject to attachment."

In the case of Davis v. McFarlane, 37 Cal. 638, 99 Am. Dec. 340, it is held that growing crops are chattels. In case of Sparrow v. Pond, 49 Minn. 412, 16 L.R.A. 105, 32 Am. St. Rep. 571, 52 N. W. 36, it is held that crops while still annexed to the soil are treated as chattels with the usual incident thereto as to seizure on attachment during the owner's life and transmission after his death, thus showing that such crops are in existence. Growing annual crops are always considered as *industriales*. Benjamin, Sales, p. 125; Tiedeman Real Prop. § 7071. In Rudolph v. Saunders, 111 Cal. 233, 43 Pac. 619, it was held that the growing crop must be attached as personal property, not capable of manual delivery. There are endless cases where attachments have been made of growing crops. Such crops have been attached long before their maturity. In Davidson v. Waldron, 31 Ill. 120, 83 Am. Dec. 206, the court said: "There is a species of personal property of which, at the time of levy, actual possession cannot be taken,— as a growing crop." In such case it were prudential in the officer to call someone or more of the neighbors to witness that he had taken it in execution, and he should indorse the same on the writ; and also many cases where the execution has been levied upon growing crops as soon as the crops are above ground. We think that our very senses understand that when we see a field of grain standing in its green condition, where from the time it just appears above ground until the same attains its full growth, that there is something in actual and potential existence. If, for instance, we see a field of wheat, luxuriant in growth, standing 10 or 15 inches high, we cannot say that there is not something in actual and potential existence; neither can we say it is of no value. Up to this point it probably cost the tiller of the soil from $5 to $8 per acre to prepare the ground, plant the seed, and nurture this crop to its present state. Can it be said then that such crop, though immature, is not in

existence and of some value? When a field of wheat has reached this stage of maturity, and at any time before this stage, it could be, and often is, the subject of sale. Therefore, such growing crops before maturity are in existence and have value and are personal property, and are sufficient to support a lien of a chattel mortgage.

Other classes of personal property are subject to mortgage even before they come into visual existence,—before the existence can be seen with the eye or before existence can scarcely be grasped by the senses. For instance: "A chattel mortgage on domestic animals which in terms covers the increase thereof, and which is executed during the period of gestation, and is duly filed for record, creates a lien upon the increase when the same are born which will continue as long as the mortgage lasts between the mortgagor and mortgagee." The material point in such cases is that such increase or such class of property shall have been in gestation at the time the mortgage was executed. The following cases hold that a mortgage which expressly mentions the increase of domestic animals covers the increase thereof, although it does not appear as a fact whether in gestation at the time the mortgage was executed: Sprenger v. Graveley, 34 Can. L. J. 135; Hopkins Fine Stock Co. v. Reid, 106 Iowa, 78, 75 N. W. 656; Packwood v. William Atkinson & F. Co. 79 Miss. 646, 31 So. 337; Cox v. Beck, 83 Fed. 269; First Nat. Bank v. Western Mortg. & Invest. Co. 86 Tex. 636, 26 S. W. 488; Funk v. Paul, 64 Wis. 35, 54 Am. Rep. 576, 24 N. W. 419.

We do not say such mortgage on such property in period of gestation on domestic animals as to third parties might continue longer than the nuture; or do we pass upon that question in this case. The principle thing we are trying to show is that the property spoken of, although it cannot be seen by the eye, is such property as a mortgage lien will attach to when the mortgage describes such property.

We think that where one, the owner of land, leases the same to another for a certain period of time and puts the other in possession and control of the work, in such case the relation of landlord and tenant exists, the tenant acquires an estate for years in the land, and the owner of the land and tenant are really tenants in common of the crop. This, notwithstanding any provision in the lease vesting the title and ownership of the crop in the landlord until division. That clause being held, when construed in connection with all other provisions of such contracts,

as being one merely for security.  Wright v. Larson, 51 Minn. 321, 38 Am. St. Rep. 504, 53 N. W. 712; McNeal v. Rider, 79 Minn. 153, 79 Am. St. Rep. 437, 81 N. W. 830.

Where a farm is rented for a share of the crops the landlord and tenant are tenants in common of the crops raised by the tenant.  Smyth v. Tankersley, 20 Ala. 212, 56 Am. Dec. 193; Knox v. Marshall, 19 Cal. 617.  Riddle v. Dow, 98 Iowa, 7, 32 L.R.A. 811, 66 N. W. 1066; DeMott v. Hagerman, 8 Cow. 220, 18 Am. Dec. 443.  Strangeway v. Eiseman, 68 Minn. 399, 71 N. W. 617; Anderson v. Liston, 69 Minn. 82, 72 N. W. 52; Avery v. Stewart, 75 Minn. 106, 77 N. W. 560, 78 N. W. 244; McNeal v. Rider, 79 Minn. 153, 79 Am. St. Rep. 437, 81 N. W. 830; Adams v. State, 87 Ala. 89, 6 So. 270; Ponder v. Rhea, 32 Ark. 435; Tinsley v. Craige, 54 Ark. 346, 15 S. W. 897, 16 S. W. 570; Creel v. Kirkham, 47 Ill. 344; Taylor v. Bradley, 39 N. Y. 129, 100 Am. Dec. 415; McLaughlin v. Salley, 46 Mich. 219, 9 N. W. 256; Rohrer v. Babcock, 126 Cal. 222, 58 Pac. 537; State Edgar, Prosecutor, v. Jewell, 34 N. J. L. 259; Wilber v. Sisson, 53 Barb. 258.

We think therefore that the mortgage of the intervener attaches to this crop, the property in question, while the same was growing, and from the time it came into existence; that a crop came into existence at least as soon as the same was above ground, and possibly was in existence at the time of the germination of the seed for the purpose of attaching of the lien of a chattel mortgage.  That such mortgage is a superior lien to that of the garnishment; that such mortgage is a first lien upon tenant's share of the crop on the land described in the intervener's complaint.

Respondent says "that if such rule is made it will disturb many contracts which are now made."  This may be true, but it will not disturb near as many as were disturbed by the Angell v. Egger decision.  We can also say that in the Angell v. Egger case the decision seems to be contradictory in its various portions and parts, and is self-conflicting, and we are satisfied it placed a wrong construction upon the provisions as to title and possession of the crops in the landlord, in such leases as have usually been the subject of discussions in all of the states.  The multiplicity of suits which have arisen since the decision in Angell v. Egger demonstrates that such decision has really never been accepted as the law of this state.  We may further say that relation of landlord

and tenant is growing more important in every year of our history. The census of the United States shows that approximately 50 per cent of tillable land is occupied by tenants. Tenancy is increasing. Each year more and more of the land, by reason of various causes, is passing out of the hands of owners, and such former owners join the army of tenants. The land is actually accumulating more and more into fewer hands and the class known as tenants are rapidly increasing, and the law of landlord and tenant is essentially growing in importance. Tillable lands are not of much value unless labor is applied to them to make them produce crops. Therefore, the tenant is at least as important a person as the landlord is, and his rights should be just as securely protected. Oftentimes the tenant has nothing with which to support his family except the crop which he contemplates sowing, or is about to sow. If his interest in such crops could be mortgaged he could obtain possibly sufficient credit to tide himself over until the maturity of the crop, but unless he can do so, his family may suffer for the very necessaries of life, because he has been held to have no mortgagable interest in such crops; or if he is a mere servant of the landlord, merchants and others can extend him no credit for the reason that they could not get security, and thus the tenant and his family are compelled to undergo great hardships and deprivations for the reason that the courts have said, under such terms as we are considering, he is nothing but a servant.

The greatness of a state or nation depends largely upon the strength, intelligence, and morality of its citizens, and in the security of their rights and privileges. A nation or state is made up of families. The family is the unit, the multiplication of which produces the state and nation; and the poor tenant who is struggling along under the adversities of life, trying to properly raise a large family, is just as important an element in the final strength of the state or nation, even though his struggle is fierce to acquire the necessaries of life for himself and family, as is the citizen of great wealth and opportunity who may be the owner of many farms, and who in many respects may have been more fortunate, subjected to less adversities, had greater opportunity, and may have been born with greater intellectuality. Government, whether state or national, should have largely for its aim the protection of the weak, the poor, and the unfortunate. The strong will generally protect themselves. Labor is the source of value. The labor

of the tenant produces abundant values upon the land he cultivates. It is his labor that produces the value. The landlord takes no part in such labor, but only provides the land upon which such labor is done to produce such crops and value, and cannot be said to be, at least, more important than the tenant, who does the work and creates value of the crops.

We think, therefore, that each should be secure in his rights, and the tenant just as secure in his rights as the landlord.

While the foregoing discussion represents in a large measure the individual views of the writer of this opinion, we are all agreed upon the conclusions reached, which may be epitomized:

1. That instruments known as cropper's contracts or farm leases, like all other contracts, must be construed so as to carry into effect the actual intention of the parties thereto. One provision cannot be singled out and given an effect nullifying other provisions, but the contract must be construed as a whole, and the real intention of the parties as thus gathered must control.

2. That where a lease of a farm on shares gives to the lessee a certain share of the crop, but contains a provision to the effect that title shall remain in the lessor until the conditions of the lease have been complied with by the lessee, he (the lessee) has an equitable interest in the crops, even prior to the performance of the conditions, which equitable interest may be mortgaged.

3. That the decisions of this court in Bidgood v. Monarch Elevator Co. 9 N. D. 627, 81 Am. St. Rep. 604, 84 N. W. 561, and Herrmann v. Minnekota Elevator Co. 27 N. D. 235, 145 N. W. 821, in so far as they announce the doctrine that a lessee under such lease has no interest in the grain to which a mortgage lien can attach until after a division of the crop has been made, are hereby overruled.

In overruling these prior decisions, we desire to say that while the rule which they announced has never been expressly repudiated, it has nevertheless been restricted and its logical soundness impliedly denied. Thus in Angell v. Egger, 6 N. D. 391, 71 N. W. 547; Aronson v. Oppegard, 16 N. D. 595, 114 N. W. 377; Wadsworth v. Owens, 17 N. D. 173, 115 N. W. 667; State Bank v. Hurley Farmers' Elevator Co. 33 N. D. 272, 156 N. W. 921; and Stavens v. National Elevator Co. ante, 9, 161 N. W. 558, this court refused to give full effect to the stip-

ulation reserving title to crops in the landowner until a division thereof, and held that where the lessee sells a portion of such grain prior to a division thereof, the landowner, in an action to recover possession or damages for conversion, is not entitled to recover the full value of such grain, but only the amount of his ultimate interest therein under the contract. These cases, therefore, recognized the fact that, even prior to division, the lessee had an equitable interest in that portion of the grain which ultimately would become his upon his complaince with the terms of the contract, and that this equitable interest passed to the purchaser of the grain. Our sister state South Dakota has expressly refused to adopt the rule laid down in Bidgood v. Monarch Elevator Co. and Herrmann v. Minnekota Elevator Co. supra, and adopted the rule which we now announce. See National Bank v. Elkins — S. D. —, 159 N. W. 60. The supreme court of Minnesota first adopted the rule announced in Bidgood v. Monarch Elevator Co. (see Porter v. Chandler, 27 Minn. 301, 38 Am. Rep. 293, 7 N. W. 142), but afterwards reversed its first holding. McNeal v. Rider, 79 Minn. 153, 79 Am. St. Rep. 437, 81 N. W. 830.

It is also of interest to note that our former Chief Justice Corliss, who wrote the opinion for this court in Angell v. Egger, 6 N. D. 391, 71 N. W. 547, appeared as counsel for appellant in McFadden v. Thorpe Elevator Co. 18 N. D. 94, 118 N. W. 242, and asserted that under the modern doctrine the provision of the farm contract reserving title in the landowner is in effect a mortgage, and that under such provision the landowner has title, and, when necessary, the right to the possession of the crops, as security for the performance of the terms of the contract by the tenant.

Judgment of the District Court, and the order denying the motion for a new trial, are reversed, and the case is remanded to the District Court for further proceedings in harmony with this opinion.