CRONE, APPELLANT, *v.* OCCIDENT ELEVATOR CO. ET AL., RESPONDENTS.

(No. 5,383.)

(Submitted March 10, 1924.   Decided March 28, 1924.)

[224 Pac. 659.].

*Conversion—Landlord and Tenant—Leases—Growing Crops— Reservation of Title in Landlord—Chattel Mortgages—Life of Lien.*

Landlord and Tenant—Reservation of Title to Crops in Landlord— Chattel Mortgage.
  1.  A contract for the cultivation of farm land on shares by the terms of which the land owner reserves title in himself to the lessee's share as security for advances made by him to the lessee is in legal effect a chattel mortgage and as such subject to the provisions of the chattel mortgage statute with reference to execution and filing.

Mortgage on Growing Crop—Life of Lien.
    2.   Under section 8290, Revised Codes of 1921, the lien of a mortgage upon a growing crop for the purchase price of farm machinery attaches only to the crop next maturing after the execution of the mortgage.

Conversion—Growing Crop—Mortgage—Failure to File—Life of Lien.
    3.   *Held*, in an action for the conversion of grain, that the fact that defendant had actual knowledge of a contract made in 1919 under which plaintiff lessor of farm land claimed to be entitled to the possession of a crop grown by the lessee as security for advances made by him to the lessee did not deprive him of his right as mortgagee of a crop grown by the lessee in 1921, the lien created in 1919 not attaching to the crop of 1921 under section 8290, *supra*.

*Appeal from District Court, Daniels County; C. E. Comer, Judge.*

Action by Emma Crone against the Occident Elevator Company and another. From a judgment of dismissal, plaintiff appeals. Affirmed.

*Mr. George Cudhie,* for Appellant, submitted a brief and argued the cause orally.

The contract in question here bears none of the earmarks or characteristics of a chattel mortgage. It does not purport to secure payment of a specific sum due at a particular time, does not provide for foreclosure and is not executed as a chattel mortgage. And further, it provides that the ownership and possession of the crops grown shall remain in the land owner. Certainly it would be a strange proceeding for the owner of the crops to take security upon his own property for the payment of a debt owing him by the other party to the contract. That it is not a chattel mortgage, see *Consolidated L. & I. Co.* v. *Hawley,* 7 S. D. 229, 63 N. W. 904; *Angell* v. *Egger,* 6 N. D. 391, 71 N. W. 547–549; *Borgood* v. *Monarch Elevator Co.,* 9 N. D. 627, 81 Am. St. Rep. 604, 84 N. W. 561; *Whithed* v. *Elevator Co.,* 9 N. D. 224, 81 Am. St. Rep. 562, 50 L. R. A. 254, 83 N. W. 238; *McFadden* v. *Thorpe Elevator Co.,* 18 N. D. 93, 118 N. W. 242; *Herrmann* v. *Minnekota Elevator Co.,* 27 N. D. 235, 145 N. W. 821; *Dobbs* v. *Atlas Elevator Co.,* 25 S. D. 177, 126 N. W. 250. The court in the last case cited said:

"The instrument is not a chattel mortgage; neither is it an instrument in the nature of a mortgage."

*Mr. Paul Babcock, Mr. John S. Nyquist* and *Mr. Howard M. Lewis,* for Respondents, submitted a brief; *Mr. Babcock* argued the cause orally.

When Mortinson contracted with the plaintiff, Crone, that she should have a lien upon his share of the crop for any indebtedness which might exist between them in her favor, such contract amounted to an equitable chattel mortgage which she had a right to enforce. Such mortgage, however, would not be binding upon any subsequent mortgagee or purchaser unless the same was filed. The supreme court of Minnesota has held that a contract of this character is in effect a chattel mortgage. (*McNeal* v. *Rider,* 79 Minn. 153, 79 Am. St. Rep. 437, 81 N. W. 830; *Strangeway* v. *Eisenman,* 68 Minn. 395, 71 N. W. 617; *Anderson* v. *Liston,* 69 Minn. 82, 72 N. W. 52; see, also, *Johnson* v. *Crawfoot,* 53 Barb. (N. Y.) 575; *Betzinger* v. *Schuyler,* 46 Hun (N. Y.), 349; *Kelly* v. *Goodwin,* 95 Me. 538, 50 Atl. 711; *Hudson* v. *Glens Falls Ins. Co.,* 218 N. Y. 133, L. R. A. 1917A, 482, 112 N. E. 729.)

MR. JUSTICE STARK delivered the opinion of the court.

Claiming that under the terms of the contract hereafter referred to she was the owner of and entitled to the proceeds of a'l the grain grown during the year 1921 upon the land therein described, plaintiff brought this action to recover the same from the defendants, who were in possession thereof, according to her allegations. The case was tried without a jury, and at the close of the testimony the court found the issues for the defendants and a judgment of dismissal was entered, from which the plaintiff has appealed.

Neither the plaintiff nor the defendant made a request for findings of fact and conclusions of law at the close of the evidence, and the trial judge did not make any, but only entered

a general judgment of dismissal, so that we are not advised of the particular reasons which impelled his conclusion.

Since no question was raised as to the form or sufficiency of the pleadings and the action was tried on the theory that it was one in conversion, we shall so treat it.

The facts developed at the trial were substantially as follows: On January 20, 1919, the plaintiff, who was the owner of a farm located in Daniels county, entered into a written contract with Fritz Mortinson, by the terms of which the latter was to well and faithfully till and farm the land during the years 1919, 1920 and 1921, commencing on March 1, 1919, and ending on March 1, 1922, in good and husbandman-like manner and according to the usual course of husbandry. Mortinson agreed to sow and plant the land in such crops as plaintiff should direct, and to furnish all tools, implements, machinery and hired help, and cultivate the land to the best advantage and according to his best skill and judgment. The contract enumerated many things to be done by Mortinson in the way of keeping up the premises which it is not necessary to refer to. Amongst its provisions is one that he shall not sell or remove "any produce of said farm * * * until final settlement without the written consent" of plaintiff, "and until such settlement, the title and possession of all * * * grain * * * grown or produced on said premises shall be and remain in the party of the second part [plaintiff], and said party of the second part has the right to take and hold enough of the crop * * * and products that would on the division of the same belong to said party of the first part [Mortinson], to repay any and all the advances made to him by the party of the second part, and interest thereon at twelve per cent per annum, and also to pay all indebtedness due said party of the second part by said party of the first part, if any there be."

Plaintiff agreed to furnish the seed necessary to sow and plant the land and pay one-half of the threshing bill and also

for one-half of the twine and to pay for the materials required to keep the buildings and fences in repair.

The compensation of the parties for their several obligations is provided for as follows: "In consideration of the faithful and diligent performance of all the stipulations of this contract by the party of the first part, the party of the second part agrees, upon reasonable request thereafter made, to give and deliver on said farm, the one-half of all grains, vegetables, so raised and secured upon said farm during said season 1919. The party of the first part to deliver the share of the party of the second part as [at?] the elevator."

At the time of the execution of this contract plaintiff sold to Mortinson some farm equipment, consisting of horses, harness and machinery, which was still on the farm at the time of the delivery of the grain hereafter referred to, and at that time there was still due to her over $1,000 on the purchase price thereof.

On September 21, 1920, Mortinson executed and delivered to the defendant State Bank of Madoc a chattel mortgage to secure a note for $450, due one year after date, upon certain personal property, and also "all of mortgagor's undivided one-half interest in all crops of every kind, nature and description, cultivated or harvested during the year 1921" upon the land described in the contract, which was duly filed in the proper office, and of which the defendant elevator company had actual, timely notice.

In the fall of 1921 Mortinson threshed all grain grown upon the land during that season. The threshing commenced September 2 and was finished September 4. Under direction of Mortinson all the grain was hauled directly from the threshing machine on plaintiff's farm and delivered to the defendant Occident Elevator Company at Madoc, where it was received by James Durkin, as its agent. As the grain was delivered, scale tickets or checks were issued to the drivers of the teams hauling the grain. These checks were dated on the day the delivery

was made, September 2 and 3, 1921, and were issued in the name of "Mortinson-Crone." On the evening of each day Durkin divided the grain in two parts, for each of which he issued storage tickets—one to the plaintiff for one-half, and one to Mortinson for the other half. On September 6, 1921, after the delivery of a part of the grain, the Occident Elevator Company issued a check in payment for Mortinson's share payable to Mortinson and the State Bank of Madoc. The check was for $576.50. This check was afterwards indorsed by both Mortinson and the bank, and was cashed by and the money deposited with the defendant State Bank of Madoc to the account of Mortinson, who thereupon issued a check payable to the State Bank of Madoc against this deposit for $392.50. On September 23 another check was issued by the elevator company for the grain so delivered, for what purported to be the balance of the share belonging to Mortinson. This check was for $194.35, and was also made payable to Mortinson and the State Bank of Madoc. This check was also indorsed by both payees, and the money placed to the credit of Mortinson in the bank, and with the previous check of $576.50 represented the whole amount paid by the elevator company for Mortinson's alleged one-half part of the grain grown upon the land in question during the year 1921—in all, $770.85.

James Durkin, manager for the elevator company, testified that about July 20, 1921, the plaintiff came to see him at the elevator relative to the division of the grain between herself and Mortinson for the year 1921, and in the course of the conversation stated to him "that she had always divided her grain out on the farm at the machine, but this year she wasn't going to have that done; she was going to have it divided—if she could, have it divided in the elevator." Witness advised her that that was the common practice and plaintiff then stated that would be satisfactory. This witness further testified that about the 10th of September, 1921, plaintiff again came to see him at the elevator about her grain, when he advised her that

the grain had been divided, at which time she claimed to be the
owner of all the grain, and protested against the division, but
that when he called her attention to the conversation of July
20 "she said that was all right.  She said it was perfectly all
right to divide the grain," and that she would go out to see
Mortinson and have him haul the rest of the grain.  The plain-
tiff denied these conversations, and further testified that on
September 8, 1921, she served a written notice upon the elevator
company that she claimed "a contract lien upon all grain
grown, harvested and threshed by Fritz Mortinson upon" the
land mentioned in the contract, and that she claimed to be the
owner of all such grain, and stated that this notice was
served upon Durkin as the manager of the elevator company.
The witness Durkin denied that any such notice was ever
served upon him.

On August 17, 1921, the plaintiff wrote to Mortinson: "Your
letter about the twine and grain hauling is at hand.   *   *   *
It will suit me fine to have our grain hauled to the elevator
right from the machine."

Carl B. Ross, cashier of the defendant bank, testified that
he did not know of the indebtedness of Mortinson to plaintiff
until advised of the same by the plaintiff in the latter part of
September, after all payments for the grain had been made,
and did not know that plaintiff was claiming the other half of
the grain at the time the elevator company issued the checks to
the bank and Mortinson.

1. There is some discussion in the briefs of counsel as to the
nature of the contract which was entered into between the
plaintiff and Mortinson, but in the view which we take of the
case it is not important to name this instrument as a "lease"
or a "contract" of another nature, or to determine whether
the parties thereto sustain the relation of "landlord and
tenant," "owner and cropper," or "master and servant."

The clear intent of the instrument was that after the divi-
sion of the grain one-half of it should belong to the plaintiff

and one-half to Mortinson. Under the letter of the contract the division was to be made by the plaintiff, but this did not require that its actual physical separation should be made by her in person. Whether such a division was made by her or for her was a question of fact, and upon which there was a conflict in the testimony. As above pointed out, Durkin, manager of the defendant elevator company, testified that on July 20, 1921, plaintiff arranged with him to have the grain divided at the elevator instead of on the farm, as had been done theretofore, and on August 17 the plaintiff wrote to Mortinson: "It will suit me fine to have our grain hauled to the elevator right from the machine." And Durkin further testified that on September 10, after part of the grain had been divided and plaintiff had received her portion thereof, she said to him: "It was perfectly all right to divide the grain," and then advised Durkin that she would go out to the farm and have Mortinson haul the rest of the grain. While the plaintiff made categorical denials of the statements alleged to have been made by her to Durkin, if the court accepted the Durkin testimony as true, as it had a right to do, it would follow as a necessary conclusion that the plaintiff had authorized the hauling of the grain to the elevator for the purpose of division; that it had actually been divided by Durkin, and that plaintiff, with full knowledge of the facts, had subsequently ratified his acts. So that, whether the instrument in question was a lease or a contract of another nature, the fact remains that plaintiff received the full amount reserved to her therein as compensation for the use of her land.

2. But the plaintiff claims that, since Mortinson was indebted [1] to her in a sum of more than $1,000 on account of the farming equipment which she sold to him, she was the owner of and entitled to the possession of the other half of the grain crop, or its proceeds, for the payment of that amount under the provisions of the contract, to the effect that until final settlement the title and possession of all the crop should remain in

her for the repayment of any indebtedness due to her from Mortinson. The position of the defendants is that this provision amounts only to an attempt to create a chattel mortgage, and, since the contract was not executed and filed as provided by the chattel mortgage statutes, it had no validity or binding, force as to them.

We think the contention that the above-mentioned provision amounts to a chattel mortgage must be sustained. A mortgage is defined by section 8246, Revised Codes of 1921, to be ''a contract by which specific property is hypothecated for the performance of an act, without the necessity of a change of possession.'' The indebtedness from Mortinson to plaintiff had no connection with the operation of the farm. As to this amount the reservation of title and possession of the part of the grain which belonged to Mortinson upon division was an attempt by the contract to create in plaintiff the right to satisfy her claim out of this grain or its proceeds. This constituted a mortgage.

Identical provisions in similar contracts have been construed in different jurisdictions and have generally been held to be in effect chattel mortgages. In the case of *McNeal* v. *Rider,* 79 Minn. 153, 79 Am. St. Rep. 437, 81 N. W. 830, the supreme court of Minnesota had under consideration a contract identical with this one, and held: ''A contract for the cultivation of a farm on shares, in and by the terms of which the landowner reserves the title to the cropper's share of the crops raised, as security for advances made to him, is in legal effect a chattel mortgage, in so far as it operates as security for the payment of such advances.'' This decision was based upon prior holdings of that court to the same effect in *Wright* v. *Larson,* 51 Minn. 322, 38 Am. St. Rep. 504, 53 N. W. 712; *Merrill* v. *Rossler,* 37 Minn. 82, 5 Am. St. Rep. 822, 33 N. W. 117; *Strangeway* v. *Eisenman,* 68 Minn. 395, 71 N. W. 617; *Anderson* v. *Liston,* 69 Minn. 82, 72 N. W. 52.

In *Minneapolis Iron Store Co.* v. *Branum,* 36 N. D. 355, L. R. A. 1917E, 298, 162 N. W. 543, the contract under con-

sideration contained the same provision, and that court, after an extended examination of the entire instrument, said with reference to this particular clause: "We say that the meaning of such provision in such contract must be deducted by construing such a provision in connection with all other provisions of such contract, and when so construed such a provision in the contract—that is, that the title and possession of all the crops shall remain in the landlord until division thereof—simply means that the landlord has a chattel mortgage on the tenant's interest for any advances made by the landlord to the tenant." This case reviews the former decisions of that state upon such contracts, and expressly overrules the case of *Angell* v. *Egger,* 6 N. D. 391, 71 N. W. 547, which is cited and relied upon by counsel for plaintiff in his brief.

In the case of *Hudson* v. *Glens Falls Ins. Co.,* 218 N. Y. 133, L. R. A. 1917A, 482, 112 N. E. 728, the court held that, where a tenant and landlord contracted that title to hay to be grown on leased premises should remain in the landlord as security for the faithful performance of the contract by the tenant until fully performed, the contract was in effect a mortgage on the hay. To the same effect is *Kelley* v. *Goodwin,* 95 Me. 538, 50 Atl. 711.

The case of *Cook-Reynolds Co.* v. *Wilson,* 67 Mont. 147, 214 Pac. 1104, involved the determination of whether or not a contract constituted a lease or cropping agreement. This contract contained a reservation of title to the grain crops grown on the premises described, having the same effect as the one here under consideration. In holding that the contract was a lease notwithstanding this reservation, after quoting from *Strangeway* v. *Eisenman, supra,* the opinion says: "We agree with the Minnesota court that the only effect that can be given to the provision for title to remain in plaintiff is to construe it as providing a lien to secure delivery to plaintiff of its share of the grain crops."

Although there are decisions to the contrary, it seems to us that the better reasoning, as well as the weight of authority, is to the effect that a provision of this kind in such a contract is in effect only a mortgage and should be controlled by the statutes governing chattel mortgages.

3. To meet the contingency of the contract being held to be a [2, 3] chattel mortgage so far as it relates to the $1,000 claim, counsel for plaintiff says that, even though the contract was in effect a chattel mortgage, and should have been executed and filed as such in order to entitle plaintiff to a valid lien upon the grain in question as against the defendants, still the evidence shows that they had actual notice of the provisions of the contract or of sufficient facts to put them on inquiry, and therefore cannot take advantage of the fact that it was not so executed and filed.

We do not deem it necessary to pursue this subject, for we are confronted with the following provisions of section 8290, Revised Codes of 1921: "A mortgage may be given upon a growing crop, or a crop to be grown, and the lien thereon continues after severance, whether remaining in its original state or threshed or otherwise prepared for market; provided, however, that the lien of such mortgage shall attach only to crops next maturing after the execution of such mortgage, except in case of mortgages to secure the purchase price or rental of land upon which such crops are to be grown."

Although the defendants may have had actual notice of the terms of the contract, so that they would have been bound thereby as to the crops grown upon the land which matured next after its execution, their rights could not be affected beyond that time, since under the express provisions of the statute the lien of the mortgage did not and could not extend beyond that crop, and therefore the plaintiff was not entitled to the possession or proceeds of Mortinson's half of the 1921 grain crop as against them.

In view of what has been said, it is our opinion that the trial judge was fully justified in reaching the conclusion which he did, and the judgment appealed from is affirmed.

*Affirmed.*

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES COOPER, HOLLOWAY and GALEN concur.